**BLANKS v. SAENGER THEATERS, Inc.,**
**et al.***

No. 4084.

Court of Appeal of Louisiana. Second Circuit.
Jan. 14, 1931.

O. A. Easterling and A. B. Guthrie, both of Monroe, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellees.

McGREGOR, J.

On January 7, 1930, Mrs. Josephine McNally Blanks, plaintiff herein, attended a performance in the building in the city of Monroe known as the Saenger Theater. This building is at the corner of De Siard and Third streets, fronts on the north side of De Siard, and is on the east side of Third. Plaintiff emerged from the said building through the De Siard street exit and was proceeding toward her home, walking along the west side of the building, going north on Third street. As she was thus proceeding, and when she was about one-half the length of the building from the corner, she was suddenly struck

*Rehearing denied February 16, 1932.

from above by a metal automatic fire escape drop ladder. One end of this ladder was attached to the building about twelve feet above the level of the sidewalk, and the entire ladder was held suspended at this height, parallel with the sidewalk, by means of a counterbalancing weight and chain. The ladder is so constructed that when one walks upon it the weight overcomes the balance and causes the unattached end to descend to the sidewalk in such position as to allow free passage down. Immediately at the attached end of the ladder there is an iron balcony and a door leading into the building at the second floor. This door is equipped with what is known as a riot lock, specially made for public buildings. It is so constructed that one can always go out by it, but if it locks properly, one cannot enter it from the outside. The reason for this is obvious; that in case of fire or sudden emergency persons may leave the building by this exit without hindrance, and that no one shall enter thereat. The plaintiff was not aware of any danger, but just as she was walking under the parallel ladder the unattached end suddenly descended without warning upon her and struck the right side of her face and head, and also her right shoulder and arm, with the result that she was thrown violently upon the sidewalk and rendered unconscious. It developed afterward that the cause of the ladder falling was that a young boy, apparently about fourteen years of age, stepped upon it from the iron balcony and caused the unattached end to descend to the sidewalk as it was designed to do. Where the boy came from or who he was is not known, as he left the scene during the excitement, while the plaintiff was being resuscitated and placed in an automobile to be carried home.

Plaintiff called a physician who came to her home and administered the necessary treatment. Afterward she went daily to the physician's office for several days, and later at varying intervals for several weeks. This suit was filed on November 4, 1930, and trial was had on January 15, 1931. The same physician who treated her examined her on the day before the trial and found her complaining of pain in her shoulder and elbow.

In its answer the defendant denied the fact of the injury, and alleged that the Saenger Theater, known at the time of the trial as the Paramount Theater, is equipped with an exterior fire escape consisting of an iron balcony, which is reached from the door leading directly into the building, and a ladder counterbalanced so that it is suspended parallel with the sidewalk, which fire escape was constructed in accordance with the laws of the state of Louisiana, and after approval of plans and specifications therefor by the state fire marshal. It specially alleged that the said fire escape was constructed of a lawful type and was maintained in a safe and careful manner and was inspected regularly by the state fire marshal and his assistants under his supervision and control. It is then alleged that if plaintiff was struck by the fire escape ladder, as she claimed, the cause of it descending upon her as it did was the walking thereon by the unidentified boy referred to above; an unauthorized person not connected with defendant, over whom it had no control and for whose negligence it is not liable. In other words, the defense is that the proximate cause of plaintiff's injury was the negligence of the boy in walking upon the fire escape ladder, and not the construction and maintenance of the fire escape in the position and manner as alleged. There was judgment in the lower court for the defendant, rejecting the demands of the plaintiff, and she has appealed.

### Opinion.

There is practically no dispute as to the facts of the case and as to how the accident occurred. The plaintiff bases her claim for damages upon the theory that the construction and maintenance of the fire escape in the manner in which defendant did was negligent and the proximate cause of her injury. So that in order to decide the case it is necessary to determine whether the defendant was guilty of negligence in the construction and maintenance of the fire escape; and, if so, whether this negligence was the proximate cause of the accident and the resulting injury to the plaintiff.

On the trial of the case, it was proved that defendant's fire escape was constructed in accordance with plans and specifications approved by the state fire marshal and strict compliance with the law. The law governing the construction of fire escapes is Act No. 300 of 1926. There is nothing in the act that provides for or permits the construction of a fire escape in such a way that there shall be a drop ladder working on a hinge and held in a horizontal position above the sidewalk by a counterbalancing weight. An automatic drop ladder or cantilever attachment is permitted in certain cases; but it is not provided anywhere that this should be suspended over a street or sidewalk. The law is very strict. It provides for internal and external escapes. It specially states that if a building requiring a fire escape is so situated that neither an internal nor an external one can be constructed, the proper officer shall give written notice to the owner to discontinue its occupancy. If an external fire escape cannot be erected without trespassing or encroaching upon the property of the owners of adjoining lands or buildings, the law makes it mandatory that only internal fireproof means of escape shall be erected. The fire escape erected by defendant in connection with its theater is an exterior one and is on the side of the building along which the sidewalk of Third street

runs, and the last section of it consists of a drop ladder working on a hinge and held in a horizontal position immediately above the sidewalk by a counterbalanced weight. If anything should happen to the mechanism that holds the counterbalancing weight in place, or if any one should step upon the ladder, it would instantly fall to the sidewalk upon any one that should be walking underneath it. The plans and specifications in accordance with which this fire escape was built and which were approved by the proper officer called for it to be thus built and suspended over the heads of pedestrians. Would the fact of this approval justify the defendant in so building it if, in the nature of its construction, it was and is a menace to the public when walking underneath it?

In their brief counsel for defendant say:

"The law requires that defendants do certain things. Those things they have done and it cannot now be said that they must be penalized for having complied with the law."

They say further:

"The operation of the theater is now and has been, and was particularly on January 7, 1930, under the strict observation and supervision of the State Fire Marshal. Deputy Fire Marshal McStravick makes and has made regular and critical inspections. The fire escape shortly before the accident was inspected and approved by him."

■ It must be borne in mind that the law, neither directly nor indirectly, provides that in the construction of fire escapes they shall be built so as to descend upon sidewalks and streets, or that the last section shall consist of a drop ladder suspended horizontally in mid-air in such cases. It is true that the officer to whom is delegated the duties of approving and supervising the construction and maintenance of these apparatuses did permit and approve of the construction of the defendant's fire escape so that it should thus descend upon the sidewalk, and that the last section of it should consist of a drop ladder suspended horizontally in mid-air some twelve feet above the level of the sidewalk. But the fact that the officer did so approve of it cannot relieve defendant of liability for any damage that may be caused by it. That would be tantamount to conferring upon this officer both legislative and judicial powers.

■ In order that no private rights may be encroached upon, the law specially provides that, unless the fire escape can be so constructed as not to encroach or trespass upon the property of owners of adjoining lands or buildings, the occupancy of the building for any purpose which makes the said building amenable to the fire escape provision of the law shall be abandoned. No provision is made for the protection of pedestrians from the construction of fire escapes. That was deemed unnecessary. In the very nature of things,

it would be contrary to law to construct a fire escape in such a manner that it would be a constant menace to the public. In order to avoid encroaching and trespassing upon private rights of property, the law specially provides for the construction of an internal fireproof means of escape. So, in order to prevent the erection of an external fire escape in such a manner as to endanger the life of the public, it would be permissible under the statute, and mandatory under the general law, to build an internal fireproof means of escape; or, if necessary for the protection of the public, all or a portion of the building should be set back off the line of the sidewalk a sufficient distance to provide for the erection of the fire escape.

It would seem that the erection of any kind of contrivance or apparatus over the heads of pedestrians in any way except in an absolutely stationary manner is bound to be classified as dangerous and a constant menace. To say the least, an automatic drop ladder of the type used in the erection of defendant's fire escape which caused the injury to plaintiff is a veritable trap, designed to be thrown as effectively and quickly as any trap set by trappers, and designed to ensnare and entrap instantly the animals coming in contact therewith. It is specially designed to operate quickly and surely upon a person's putting his weight upon it. The ladder operates upon a hinge, and is designed to descend quickly to the ground; and it ought to be so built as to descend at a place where pedestrians are not apt to be and have no right to be.

No cases have been found in our state reports involving facts parallel with the case under consideration. But plaintiff has cited one from the Court of Appeal of Missouri. It is the case of Roper v. Wadleigh, 219 S. W. 982. The statement of that case is in the following words, and shows it to be as nearly on all fours with the one at bar as is ever found:

"The building fronted east, and on the south side, on Fifth street, this outside fire escape had been connected with the balcony. A large door opened from the balcony onto the landing of the fire escape, which was directly over the sidewalk. A stairway fastened into the side of the building led from this balcony downward to within 10 or 12 feet of the sidewalk. Then there was what is called a drop ladder working on a hinge and held in a hoizontal position above the sidewalk by a heavy weight of some 75 to 80 pounds. When any person wanted to leave the building by the fire escape he went from the balcony through the door and down the steps to the drop ladder. Stepping on this, his weight would cause the ladder to descend till the end rested on the sidewalk, thus forming an outside stairway to the sidewalk. When in usual position, this drop ladder formed no obstruction to the sidewalk as pedestrians walk-

ed under it, but when it came down it did so on the sidewalk.

"On the occasion of plaintiff's injury a capacity house had been witnessing a boxing match at this theater, and, the 'bout' being over, the audience were leaving the building. As plaintiff was quietly walking along the sidewalk under the fire escape, unaware of the impending danger, a number of persons made their exit from this building by way of the fire escape, and, coming to the drop ladder thereon, the same descended without warning on plaintiff's head, crushing him to and on the sidewalk inflicting injury. Every witness agreed that this fire escape with the drop ladder, when used for persons to descend thereon, was not only likely, but certain, to injure any one who might happen to be passing along the sidewalk at that particular place.

"The negligence alleged in the petition on which the jury found for plaintiff is that said fire escape was negligently and carelessly constructed in that it protruded over the sidewalk, and was so constructed that, when persons proceeded from said building down same and stepped on the part called the drop ladder, the same would automatically fall to the sidewalk to the injury of any one using the sidewalk at that place."

The defense in that case was practically identical with that of the defendant in this one. It was specially pleaded that:

"(1) An ordinance of Joplin required fire escapes for buildings used as this one was and permitted same to project into the highway not exceeding four feet and permitting drop ladders such as this one; and (2) that this building was leased to and under the entire control of Jimmie Bronson as tenant, and that the persons who used said fire escape to plaintiff's injury did so without the knowledge, consent, or authority of defendant."

The defense in the cited case is stronger, in that the law in that case not only required fire escapes as does our law, but specially permitted them to be erected so as to project over and into the street a distance of four feet, and specially provided for and permitted the drop ladder type to be thus suspended. In passing on the matter, the court said:

"While the ordinance of Joplin mentioned requires fire escapes for buildings of this character, it no more than permits same to project into a public highway not over 4 feet and requires drop ladders only if the fire escape is so constructed that the lower balcony is more than 14 feet above the sidewalk or ground. This ordinance must be taken as merely permissive on the part of the public and municipality. Streets and sidewalks are primarily and essentially maintained for travel thereon, and ordinarily a municipality cannot grant such a use of a street as makes it dangerous and unsafe, and 'any object in the street or sidewalk, under it or over it,

which without notice or warning to the public is likely to cause injury to a person using the street or sidewalk, is certainly negligently maintained.' 28 Cyc. 873, also pages 859 and 861.

"Nor do we think that the owner of a building abutting thereon has any right at common law to maintain even so necessary a thing as a fire escape over, and when in use violently descending on, a much-used public sidewalk. The owner of property must subordinate its use to the safety of the public. Defendant could not have used this building to store dynamite therein because of its being in a populous city, and it may be that it was so situated that it could not safely, and therefore should not, have been used as a theater because of the inability to have proper fire escapes and at the same time not endanger the use of the sidewalk. Such fact in no way excuses a structure dangerous to those using the sidewalk."

█ In that case, a number of persons made their exit from the building by way of the fire escape, and their going upon the drop ladder caused it to descend suddenly; whereas in the present one only one boy went upon it, and it is not shown where he came from or how he got on it. But the principle is the same. In each case a human trap was set, and the approximately delicate "trigger" was touched and a person was injured by the sudden descent of the drop ladder. As was said in the Roper v. Wadleigh Case:

"Streets and sidewalks are primarily and essentially maintained for travel thereon, and ordinarily a municipality cannot grant such a use of a street as makes it dangerous and unsafe, and 'any object in the street or sidewalk, under it or over it, which without notice or warning to the public is likely to cause injury to a person using the street or sidewalk, is certainly negligently maintained.' 28 Cyc. 873, also pages 859 and 861."

If it is true that the owner of a building is negligent in thus erecting and maintaining a fire escape where there is an express statute permitting it, it is all the more negligent in cases where there is no express statute permitting it, and the only authority for the erection and maintenance of such apparatus is the approval of the supervising and inspecting authority.

In support of the contention that the defendant's automatic drop ladder fire escape suspended horizontally in mid-air over and above the sidewalk set apart for pedestrians is not a menace and dangerous, and that to so erect and maintain the same is not negligent, counsel cite the case of Heva v. Seattle School District, 110 Wash. 668, 188 P. 776, 777, 9 A. L. R. 267. The sentence quoted from the case is as follows:

"The ladder is a simple appliance, not inherently dangerous, and as a rule any child

old enough to climb one has intelligence enough to realize that if he falls injury and pain will follow."

A careful reading of the case shows that the plaintiff, a boy over twelve years old, climbed upon a fence close to a schoolhouse and pulled himself up to a ladder that was attached to the building for a fire escape, and ascended thereon to the top of the building. Later, while he was on top of the building, he lost his balance, tripped and fell off the edge of the roof and landed on a part of the fire escape. The demand for damages was based on the theory that a fire escape ladder on the outside of the building is an attractive nuisance and dangerous. In that case, the fire escape did not extend over a sidewalk, nor was it built in the form of an automatic drop ladder. It was stationary and attached firmly to the building throughout its entire extent. There is no similarity between the two cases, and the court very properly rejected the demands of the plaintiff and held that the fire escape ladder was not an attractive nuisance.

■ Counsel for defendant urge that the Roper v. Wadleigh Case cannot be relied upon as authority, for the reason that it was decided on the theory that the defendant could and should have reasonably anticipated that the fire escape attached to its building would be used in such a manner as to inflict injury in the event steps were not taken to prevent its use, and that there is no such allegation in the petition in the case at bar. It is not necessary that defendant should have anticipated, and that plaintiff should have so alleged, that this drop ladder would be used in such a manner as to inflict injury. It suffices that the ladder in itself is a menace to the safety of pedestrians, and is accessible to all the attendants of the theater. In fact it was proved by the then manager of the theater that that exit and ladder was used almost "often". He testified as follows:

"Q. Does anybody ever stand there to keep your customers from going through that door? A. We try to keep people from going out or coming in because it is a fire exit.

"Q. They couldn't come in there could they? A. Well, they can get in, yes sir.

"Q. How? A. You see these doors have riot locks, what they call riot locks, a special lock made especially for public buildings. Sometimes these locks don't catch. In other words you can always go out and sometimes they don't catch and you can open them and come in. Lots of times we had lots of trouble from boys opening the door—pushing down on the door a little bit and the boys from the outside coming in.

"Q. How would they get on that platform? A. Jump up on the fire escape.

"Q. Did people make a habit, when you were not watching that door, of leaving the theater by that door? A. Yes, sir, it is used. Both places are used. We tried as I say, the best way possible, to discourage the use of the fire escape as a means of exit or entrance.

"Q. Anyone ever placed there after a show for the particular purpose of keeping people from going out there? A. No sir, not as a rule.

"Q. Was it done on January 7th, the day this accident happened? A. Not under my instructions they were not, no sir.

"Q. Mr. Greenblatt, have you ever had your attention called to the fire escape touching the ground—suspended end being down on the ground? A. Yes, sir.

"Q. It was frequently down? * * *

"Q. Have you ever had your attention called to that? A. Yes, sir.

"Q. Was it often? A. Well, no, not in the sense that you would use 'often.'"

■■ No objection was raised to the reception of any of this testimony; therefore, if it were necessary for plaintiff to make such an allegation as is contended for, this testimony received without objection is sufficient to amend the pleadings in that respect, and so, under the testimony the defendant not only should have reasonably anticipated that this fire escape might be used in such a manner as to inflict injury on pedestrians, but it was proved that the defendant's manager actually knew that persons on more than one occasion did go out at that exit and down that drop ladder. In other words, it was proved that the drop ladder was dangerous, and that it was easily possible for persons to leave the theater by that means of exit. In their brief, defendant's counsel say:

"Of all the people who could have used the fire escape, it was used by only one boy. The fact that only one boy used it and the fact that the record discloses no uses of the fire escape on former occasions is a direct argument to the existence of conditions contrary to those found in the Missouri case."

In the Missouri case, it is stated specially that:

"Nothing was shown as to its use on previous occasions, but the number and readiness with which people used it on this occasion bespeaks familiarity and shows the ease of so using it."

In his testimony, the manager of defendant's theater said:

"Lots of times we had lots of trouble from boys opening the door,—pushing down on the door a little bit and the boys from the outside coming in."

He stated further that some people made a habit of leaving by that exit. So counsel is in error in arguing that defendant should not have reasonably anticipated that the fire escape would be used as an exit, for it was

often so used to the knowledge of its manager.

But conceding for the sake of the argument that defendant was negligent in the erection and maintenance of the fire escape, counsel argue that this negligence was at best a remote cause and not the proximate cause; that the boy coming upon the ladder was a responsible person, and consequently the proximate cause of plaintiff's injury. Undoubtedly if this boy could be found plaintiff would have a cause of action against those responsible for his acts. But does this fact mean that defendant's negligence in the erection and maintenance of its fire escape was not also a proximate cause of plaintiff's injury?

"Definitions and tests are inadequate to afford a definite and invariable rule whereby a line can be drawn between those causes which the law regards as sufficiently proximate and those which are too remote to be the foundation of an action." 45 C. J. 900.

There have been an infinite number of definitions of proximate cause formulated by the courts and law-writers, and in the final analysis practically every case developes a state of facts that justifies a special definition of the term. In this case, the negligence of the defendant in the erection and maintenance of the fire escape and the stepping upon it by the boy and causing it to suddenly descend to the sidewalk and strike plaintiff were concurrent causes, and each may be said to be a proximate cause. It is not necessary to render defendant liable to show that its negligence was the sole cause. It is sufficient to show that its negligence concurred with that of the boy. Proximate cause has been defined as an act without which the injury would not have been caused. If defendant's fire escape had been a stationary ladder leading to the sidewalk below, the exit of the boy would not have caused plaintiff's injury. If, on the other hand, the horizontal suspended drop ladder had not been over the sidewalk but had been over defendant's own property no injury would or could have been inflicted upon plaintiff as she was walking upon the sidewalk where she had a right to be in safety. It is immaterial where the boy came from or how he got on the ladder. His stepping on it caused it to descend. Furthermore, it descended because of the negligent manner of its construction; being left suspended over the heads of persons in such a way as that the mere stepping on it by a boy caused it to descend upon plaintiff walking on the sidewalk. The negligence of the defendant in the manner of the erection and maintenance of the fire escape and that of the boy in stepping on it concurred in causing the injury. Without the negligence of the defendant, that of the boy would not have been ef-

ficient. The condition of the fire escape was of such a nature that the defendant should have reasonably anticipated such an injury as plaintiff received; it was of such a nature that it was practically impossible to avoid the injury in the event of such a concurring of contributing causes as a person stepping on the ladder as the boy did.

The question of proximate cause is an intricate one, and is often near the border line. The principle involved is simple, but difficulty usually arises in applying the principle to a given state of facts. This case has given us much concern, and we have made an exhaustive examination of authorities and have read many cases. It would be useless to undertake to refer to them all or to try to harmonize and reconcile the varying views found therein. There are two outstanding cases that involve the question of what might be termed concurring proximate causes. We refer to them as briefly as possible in support of our finding that defendant's negligence is a proximate cause of plaintiff's injury, concurrent with the negligence of the unknown boy. City of Rock Falls v. Wells, 169 Ill. 224, 48 N. E. 440, 441.

The facts of the case are stated as follows by the Supreme Court of Illinois:

"Appellee, in company with her sister, a young girl, was riding in a sleigh drawn by one horse, and, soon after turning into said street from another, saw a runaway horse, attached to a buggy, coming west, in the direction to meet her on the same side of the street. In order to avoid the threatened collision, appellee undertook to cross over to the opposite side of the street. Along the center of North street was an electric street railway, which was unused, and had not been used for several months. The railway ties and tracks were from 6 to 10 inches above the street, and were an obstruction to travel. The roadway on the south side of the track (the side on which appellee was) was only 10 or 12 feet wide; there being a ditch along the outside of this roadway. In endeavoring to drive across the railway track and get out of the way of the runaway horse, appellee's sleigh, when her horse got between the rails, stuck fast against the south rail; and, being unable to proceed further, she jumped out of the sleigh, and, for the purpose of warding off the approaching horse, went to the head of her horse, and struck the runaway with her whip as he approached, which caused him to veer to the south, and to strike a trolley pole. One of the wheels of the buggy was running on the track, and it, sliding upon the rail as the horse turned, struck appellee, and broke her left leg; and inflicted an apparently permanent injury."

The only contention made by the city of Rock Falls was that the negligence of the city in allowing its street to be and remain ob-

structed was only the remote, and not the proximate, cause of the injury; that the intervening efficient cause of the injury was the runaway horse, with which the city had nothing to do. Judgment was rendered in favor of the injured party in the trial court. The Court of Appeal affirmed the judgment, and, upon review by the Supreme Court, the judgment of the appellate court was sustained. In the course of its opinion, the court said:

"This court is not committed to the doctrine as laid down by the courts of some of the states, but has held 'that if a plaintiff, while observing due care for his personal safety, was injured by the combined result of an accident and the negligence of a city or village, and without such negligence the injury would not have occurred, the city or village will be held liable, although the accident be the primary cause of the injury, if the consequences could, with common prudence and sagacity, have been seen and provided against by such city or village.' City of Joliet v. Verley, 35 Ill. 58 [85 Am. Dec. 342]; Village of Carterville v. Cook, 129 Ill. 152, 22 N. E. 14 [4 L. R. A. 721, 16 Am. St. Rep. 248]; City of Joliet v. Shufeldt, 144 Ill. 403, 32 N. E. 969 [18 L. R. A. 750, 36 Am. St. Rep. 453]; Weick v. Lander, 75 Ill. 93."

Another case in point is that of Consolidated Kansas City Smelting & Ref. Co. v. Binkley et al., 45 Tex. Civ. App. 100, 99 S. W. 181, 182. The facts of the case are stated by the Court of Civil Appeal of the State of Texas, as follows:

"The amended original petition alleged that plaintiff Chas. H. Binkley, whilst in the discharge of his duties as switchman for the defendant Galveston, Harrisburg & San Antonio Railway Company, was injured by being knocked from one of its freight trains in passing under a blast pipe erected at the smelting works of appellant near the city of El Paso; that he had not been warned of such danger, nor informed of the location of said pipe; and that, while letting off one of the brakes and acting in the line of his duties, he was struck on the head and shoulder as the train was passing under the pipe, knocked from the car and injured as alleged. Plaintiff alleged negligence of appellant in erecting said pipe so close to the top of the cars as to injure employees of the railway company in the operation of trains, and negligence in defendant railway company in failing to warn plaintiff of his danger and provide some means of notifying him of the proximity of said pipe."

Judgment was rendered in favor of Binkley against both defendants in the lower court. The Smelting Company alone appealed. Its contention was that the proximate cause of the injury was the negligence of the railway company in not taking due precaution to notify its employees of the proximity and danger of the pipe. In sustaining the judgment of the lower court and holding the Smelting Company concurrently liable with the railway company, the Court of Civil Appeal said:

"In placing and maintaining the obstruction so near passing trains as to endanger persons engaged in operating the trains, by their coming in contact with it, the question determining the liability of the smelting company for such consequences is whether or not such a result could be reasonably expected by an ordinarily prudent person."

In the case presently before us, the defendant cannot escape the conclusion that it should have reasonably expected, yea, even known, that if a person should step on the drop ladder fire escape suspended over the sidewalk, any pedestrians that might be walking underneath it would be injured as plaintiff was. The exit in question was easily accessible to all at all times. It was easily possible for any one to use it, and defendant should have reasonably expected that various persons would use it, and that such use would be fraught with much danger to pedestrians below. It should therefore have so constructed and maintained the fire escape as to avoid the possibility of this danger, so reasonably to be expected as long as the fire escape should be maintained and kept as it was.

### Quantum of Damages.

█ Plaintiff was struck to the ground and remained there unconscious until she was picked up by a passer-by. She was struck a glancing blow on the right side of her head and face and the right shoulder and arm. Dr. Guerriero treated her for several weeks by her coming to his office. He describes her injury as follows:

"She had an extensive extravasation of blood in the subcutaneous tissue just under the skin from her shoulder down to her wrist. This area was about five inches in width all the way down; she also complained of excruciating pain in her right elbow joint and also her shoulder joint, and her arm was markedly swollen and very painful. On the first occasion I had to see Mrs. Blanks was on the night after she was injured I believe— I believe on the 7th of January, and at that time she complained of severe suffering. I went out to her house to see her and gave her a hypodermic and left a sedative of morphine for her pain. I dressed her arm with an antiseptic dressing and asked her to report to me in the morning if possible. And from then on I treated her daily with heat treatments and antiseptic dressings for two or three weeks I believe and then she reported to me every other day for a while. This extravasation of blood under the skin remained there about six weeks."

The accident occurred on January 7, 1930, and the trial began on January 15, 1931, some few days over a year afterwards. The plain-

tiff evidently suffered severe pain and shock which must have lasted several weeks, during which time she was under the care and treatment of the physician testifying in the case. No testimony was offered by the defendant to refute that offered by the plaintiff. At the time of the trial, plaintiff was suffering from pain and swelling in the elbow joint and shoulder on motion. It is the opinion of her physician that there is no permanent disability to be expected. Whatever damages to be awarded must be for pain and suffering endured. According to the uncontradicted testimony, plaintiff's pain and suffering continued with varying degrees of intensity throughout a period of one year, and had not entirely ceased at the time of the trial. The fixing of the amount of damages to be awarded is always difficult. The Supreme Court from time to time has fixed approximate standards to guide the lower courts. In the case of Russell v. Shreveport Belt Ry. Co. et al., 50 La. Ann. 501, 23 So. 466, one of the plaintiff's shoulders was partially dislocated by a fall and his arm bruised. His injury, pain, and suffering appear to be just about equal to plaintiff's in the present case. The amount of damages awarded and approved on appeal was $1,000. That judgment was cited with approval and used as a criterion in the case of Thompson v. Commercial National Bank et al., 156 La. 479, 100 So. 688. We think this sum awarded to plaintiff will do substantial justice to both parties to the suit.

For the reasons assigned, the judgment appealed from is avoided, annulled and reversed, and it is hereby ordered, adjudged, and decreed that there be judgment herein in favor of the plaintiff, Mrs. Josephine McNally Blanks, against the defendant, Saenger Theaters, Incorporated, for the sum of $1,000, with five per cent. interest from November 7, 1930, and all the costs of both courts.